UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| PINIKA, LLC, | Case No. 1:07-cv-826 |
| Plaintiff, | HONORABLE PAUL L. MALONEY |
| v. | Magistrate Judge Ellen S. Carmody |
| METLIFE, INC., | |
| Defendant. | |

**Opinion and Order**

**Granting in part the Plaintiff's Motion for Reconsideration:**
Holding that Defendant Breached by Failing to Tender One Million Documents in Year 2;
Holding that Defendant Breached by Failing to Pay Fees due for Documents Tendered in Year 3

**Denying in part the Plaintiff's Motion for Reconsideration:**
Adhering to Determination that Defendant Did Not Breach Contract for Year 3
by Failing to Tender 1,000,000 Documents in Year 3

**Directing Parties to Jointly Calculate Damages & Interest for Years 2 and 3**

This is a diversity breach-of-contract action between Pinika LLC ("Pinika") and MetLife, Inc. ("Metlife"). This court granted Metlife's motion for summary judgment, *see Pinika, LLC v. MetLife, Inc.*, 2008 WL ____ (W.D. Mich. ____, 2008) (Maloney, J.), and Pinika timely moved for reconsideration. As ordered by the court, MetLife filed an opposition brief and Pinika filed a reply. For the reasons that follow, the court will grant Pinika's motion in part and deny it in part.

Paladigm Systems, LLC ("Paladigm") – which the court found to be Pinika's predecessor with regard to the MetLife contract, *see Pinika*, 2008 WL ___ at *__ – developed and owned

-1-

proprietary software for document imaging, archiving, retrieval, and tracking, and provided web-hosting, implementation, processing, and operation services for document-management systems. *Id.* at *____. Beginning in June 2000, the parties discussed Metlife's need for information retrieval services, and Metlife asked Paladigm to develop a system to meet its needs. *Id.* at *____. Honoring the request, Paladigm engaged in "testing, strategizing and extensive and costly technical preparations all at defendant's request and with defendant's input and knowledge" with the goal of a system that enabled Metlife to locate and access separate document images based on, among other criteria, employee names or social security numbers. *Id.* at *____.

Pinika's document-retrieval software was originally designed for a database organized document-by-document, but in response to Metlife's requests, Pinika modified it to accommodate information derived from separate documents with different dates "and distinct significance . . . ." *Pinika*, 2008 WL at *____. It proposed an application allowing "users to scroll through a document, view number of pages within a document," and offered to prepare documents for imaging by removing staples, paper clips, "sticky notes", and other impediments to scanning. *Id.* at *____.

In February 2001, Metlife and Paladigm entered into a Software Management, Web Hosting Services, and Document Management Services Agreement ("the agreement"), wherein Paladigm agreed to provide Metlife with, *inter alia*, services for the "implementation, processing and operation of a document management system." *Pinika*, 2008 WL at *____. The agreement defined "documents" to mean "any and all documents provided to Paladigm by Client for Document Management Services under this Agreement." *Id.* at *____ (quoting Agreement § 36.17).

The agreement obligated Metlife to provide "a minimum annual requirement ["MAR"] of 1,000,000 Documents . . . ." *Pinika*, 2008 WL at *____ (quoting ¶ 2.2(a)). It specified that "[f]or

the sake of clarity, 'document' may be one or more pages in length and each one-sided page of a Document which is digitized hereunder shall constitute one image." *Id.* at \*____ (citing § 36.17). Pinika stresses that the MAR was essential, and comported with its method, which was to base identifying criteria on separate *documents*, not separate pages per se. *Id.* at \*____.

In the first full calendar year, 2001, MetLife met the 1,000,000-document MAR, but in years two and three, it provided only 294,844 and 853,541 documents, *id.* at \*____ – a total of 1,148,385 documents rather than the 2,000,000 documents which Pinika *correctly* contends were required.

In the documents which Metlife did provide to Paladigm, there was an average 2.3 images per document. Applying that ratio, Pinika reasons that if Metlife had tendered the additional 851,615 documents, they likely would have contained an additional 678,141 images in year two, and an additional 1,963,144 images in year three.[1] *Pinika*, 2008 WL at \*____.

Paragraph 2.1(b) required Metlife to pay $0.13 per image, so if Metlife had tendered documents containing those additional 2,641,285 images in years two and three, it would have paid an additional $343,367. *Id.* at \*____ (citing Agreement ¶ 2.1(b) and Damage Calculations).

By letter dated January 7, 2003, Metlife informed Paladigm that it was ending the agreement effective May 7, 2003. *Pinika*, 2008 WL at \*____. Agreement § 11.10, Termination for Convenience, authorized Metlife to terminate the Agreement "and/or any of the Services being provided under this Agreement at any time for the convenience of CLIENT [Metlife] by giving PALADIGM at least three (3) months' prior written notice designating the termination date."

---

[1]

In year two, an additional 294,844 documents containing 2.3 images each would have yielded 678,141.2 additional images.

In year three, an additional 853,541 documents containing 2.3 images each would have yielded 1,963,144.3 additional images.

Metlife paid Paladigm a $9,720 early-termination fee. *Id.* at *____.

In addition, in July 2003, Metlife paid Paladigm $13,390 "prorated for four (4) months at the rate of $0.013 per document, representing 347,000 documents . . . ." *Id.* at *____.

Pinika maintained that the Termination provision did not excuse Metlife from its obligation to provide one million documents per year, for the remainder of the full contract term, as required by ¶ 2.2(a), *id.* at *____, and its motion for reconsideration unpersuasively re-argues the point.

Paladigm's assets, contractually defined to include receivables due from MetLife, were validly transferred to Pinika's predecessor in 2005. *Pinika*, 2008 WL at *____. (That eliminated a possible basis for granting summary judgment to MetLife as to all years. MetLife has not asked for reconsideration of that determination.)

Pinika sued MetLife in Michigan state court, asserting New York common-law claims for breach of contract and breach of the covenant of good faith and fair dealing, and seeking recovery of $343,367.22, plus interest, pursuant to § 2.1(f), and MetLife removed. *Pinika*, 2008 WL at *____. MetLife's answer contended that Pinika's claims fail because there was no privity of contract between the parties; were barred by the Statute of Frauds and untimely under the statute of limitations; failed to state a claim on which relief can be granted; were barred by payment and/or release; and were barred by waiver and estoppel. Metlife did not counterclaim and did not contend that Pinika breached. *Id.* at *____.

### THE PRIOR GRANT OF SUMMARY JUDGMENT TO METLIFE

The court held that, under a proper interpretation of the contract, Pinika failed to show any genuine issue as to whether MetLife breached the contract: it did not. (As discussed below, the court was correct as to Year Three but mistaken as to Year Two.)

As to Year Three, Pinika essentially contended that MetLife is liable for the amount that Paladigm would have been contractually entitled to charge *if* the contract had continued for the remainder of the originally-contemplated term (another nine months) and MetLife had tendered the minimum documents required. Pinika reasoned that because the contract does not expressly relieve MetLife of the obligation to provide 1,000,000 documents for imaging each year during the entire originally-contemplated contract term, MetLife was still bound by that obligation notwithstanding its valid termination of the contract nine months "early." Pinika argued as follows,

> *MetLife notified Paladigm that it was terminating . . . pursuant to section 11.10 of the parties' Agreement.* Contrary to MetLife's contention, this section does not excuse defendant from its obligation to meet the Minimum Annual Requirements mandated by ¶ 2.2(a) . . . or otherwise provide for any prorating thereof. [Ex 1 at 5] Section 11.10 . . . only address[es] unpaid Hosting & Maintenance Fees. *It is silent about Document Imaging charges unlike § 11.2 which discusses both types of charges*.
>
> Moreover, ¶ 11.7 ("Obligations prior to Termination/expiration"), provides, in part, "Except as set forth in this Agreement, termination or expiration of this Agreement shall not relieve either party of any obligation, charge, fee, or expense payable under this Agreement which accrued on or prior to the effective date of termination or expiration." [Ex. 1 at 13]
>
> Therefore, it is reasonable to conclude that if the parties intended that the [MAR] would not be excused since no such provision is included in § 11.10. 11.2 clearly states that Metlife will have to pay the Minimum if it breaches the contract. These two points demonstrate that the Minimum was an iron clad point in the deal. * * *
>
> Defendant's argument that it is not required to make payment, under the minimum annual document requirement, for year three of the contract because it was terminated is without merit, because the contract, by its express language, speaks to the obligations of the parties upon termination, and nowhere states that the annual minimum document requirement is terminated upon the termination of the agreement.
>
> By way of example, the contract provides in ¶ 11.11 <u>Consequences of Expiration/Termination</u> . . . [Ex. 1 at 14], for various obligations of the parties upon termination, but does not speak to the termination of the [MAR].
> * * *
> Further the contract expressly provides under ¶ 27, <u>Obligations Which Survive</u>

> Termination:
>
>> Any provision of this Agreement which contemplates performance . . . subsequent to any termination or expiration of this Agreement shall <u>survive</u> the termination or expiration of this Agreement and continue in full force and effect.  [Ex. 1 at 24]
>
> According to the preceding language, MetLife's obligation to supply the [MAR] of one million documents was obviously a requirement that would survive termination because of the enormous level of effort and expense required of Paladigm to provide the ongoing services called for by the Agreement.  The parties' omission of any reference to eliminate this requirement must be given great weight.

*Id.* at * ___ (quoting Pinika's Opp to SJ at 10-11 (emphasis added by Pinika)).

After considering § 11 (Termination) and § 27 (Obligations Which Survive Termination) and New York's canons of construction, the court rejected Pinika's argument as a matter of law.

First, the court concluded that § 27, Obligations Which Survive Termination, was of no avail to Pinika directly or indirectly.  That section merely states that any provision which contemplates post-termination performance shall survive termination, which begged the question:  *which* provisions "contemplate" post-termination performance?  Pinika did not identify any provision which a reasonable factfinder could find contemplated post-termination performance of ¶ 2.2(a)'s duty to tender at least 1,000,000 documents per year to Paladigm for imaging.

Second, Pinika was correct that, under certain circumstances, § 11.2 required MetLife to compensate Paladigm for the revenue that Paladigm would have earned under the MAR.  But this was of no avail to Pinika on the undisputed material facts.  The contract provided, in pertinent part,

> 11.1   <u>Termination of Agreement</u>.  The parties may terminate this Agreement prior to the expiration of the Initial Term or a Renewal Term, if any, as follows:
>
> (a) *PALADIGM shall have the right to terminate this Agreement upon notice to CLIENT for cause if:  . . . (iii) CLIENT materially fails to perform* or observe any of its obligations hereunder and such failure is not remedied within thirty (30) calendar days, except as otherwise provided herein, after written notice to CLIENT specifying

> such material failure.
>
> * * *
>
> 11.2 <u>PALADIGM's Remedies</u>. *If PALADIGM terminates this Agreement pursuant to Section 11.1(a),* then in addition to all other rights and remedies of law or equity or otherwise, *PALADIGM shall be entitled to recover promptly from CLIENT*: (I) all amounts due under this Agreement for the period to and including the effective date of termination, including, but not limited to, any unpaid Hosting & Maintenance Fees, and (ii) *the amounts due for Document Management Services for the then-current annual term,* which amount shall be the remaining balance of the Minimum Annual Requirement multiplied by $0.13.

*Pinika*, 2008 WL ____ at *___ (quoting Comp Ex 1 at 11-12 (emphasis added)). Pinika contended that because § 11.2 requires MetLife to pay the amount it would have paid for 1,000,000 documents for the rest of the year of termination, we can infer that "the Minimum was an iron clad point in the deal." *Id.* at *___. But § 11.2 did not support, let alone compel, such a broad inference. It required MetLife to pay for the requirement for the rest of the year <u>*only when Paladigm terminated due to an uncured breach of contract by MetLife*</u>. Neither § 11.2, nor any other provision, expressly requires MetLife to compensate Paladigm for the requirement for the remainder of the termination year when the termination was for any reason other than MetLife's uncured breach. *Id.* at *___

In fact, § 11.2 supported *MetLife's* position. Section 11.2 showed that when the parties wished to require MetLife to pay for the unfulfilled portion of the requirement during the remainder of the year of termination, they knew how to do so and did so explicitly. The court inferred from the absence of such a requirement that the parties did not intend such a requirement to apply. That is, they did not intend to hold MetLife liable for revenue loss attributable to documents that it *would have been* required to tender for imaging *if* it had not exercised its right to terminate the contract.

*Village of Freeport v. Turner Environlogic, Inc.*, 2007 WL 4532420 (N.Y. S.Ct. Nassau Cty. Dec. 12, 2007) illustrated the New York canon of construction which supported this interpretation. The Village sued Turner for breach of a procurement contract, and Turner moved to compel

arbitration pursuant to a contractual provision. The contract's components were Procurement General Conditions, Procurement Supplementary Conditions, and Modifications to Procurement General Conditions. *Id.* at *1. The Supplementary Conditions began, "These Supplementary Conditions amend or supplement the Procurement General Conditions . . . . All Conditions which are not so amended or supplemented remain in full force and effect." *Id.* at *2.

Gen. Conditions Article 15.1 required arbitration of all disputes "arising out of or relating to the Procurement documents or the breach thereof." *Pinika*, 2008 WL ___ at *__ (citing *Freeport*, 2007 WL 4532420 at *2). Gen. Conditions Article 16 provided that if the Procurement Documents conflicted with state or municipal law, the state or municipal law would prevail. Supp. Condition 16 provided that if a dispute arises, Owner and Supplier agreed to submit to the jurisdiction of the courts of Nassau County, NY. *Pinika*, 2008 WL ___ at *__ (citing *Freeport*, 2007 WL 4532420 at *2). The Village contended that Supp. Condition 16's submission to state-court jurisdiction negated Gen. Condition 15's agreement to arbitrate certain disputes. The court rejected the Village's argument as contrary to New York's established rules of construction:

> A sound principle of contract interpretation requires that the court "give effect to the intent of the parties as revealed by the language and *structure* of the contract." (Emphasis supplied.) *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914 ([N.Y. App. Div.] 4th Dept. 1996). To do so, the court must examine the document "as a whole", give effect and meaning to every term", and make a reasonable effort to "harmonize all of its terms." *Id.* at 914-15. * * *
>
> * * * The Village reads the Supplementary Condition too broadly and "in isolation from the remainder of the agreement." *Reda v. Eastman Kodak Co.*, supra. The result is that the Village's interpretation does not give effect to the arbitration provisions, and renders them meaningless. Nor does the Village make any effort to harmonize the provisions of arbitration for Procurement disputes with the provisions for litigation of disputes concerning the statute and ordinances of New York and its subdivisions. Nor does the Village consider the structure of the Procurement Documents and the manner in which specific sections are modified or supplemented. It also ignores the specific declaration that those provisions, which are not modified,

> remain in full force and effect.
>
> * * *
>
> *Moreover, the very structure utilized by the Village to supplement the General Conditions, i.e., by tying the Supplement to a specific article or section, indicates that the jurisdictional supplement expressly was intended not to affect the arbitration provisions of Article 15. To do so, it would have specifically stated that i[t] was intended to supplement Article 15, rather than Article 16. Certainly, when it was the intent of the Village to delete a provision, it knew how to do so. For example, Supplementary Condition 6.2, regarding progress payments, expressly provides for deletion of "paragraph 6.2.1 of the Procurement General Conditions in its entirety." Such language could have been employed to delete Article 15 in whole or part, fi that was the Village's intent.*

*Pinika*, 2008 WL ___ at *__ (quoting *Freeport*, 2007 WL 4532420 at *3) (nn. 3 & 4 and other citations omitted).

Pinika painted the contract as ambiguous regarding whether MetLife is obligated to pay compensation – beyond that expressly required – for the revenue that Pinika lost as a result of MetLife's termination. In light of such ambiguity, Pinika contended, New York law requires the court to examine extrinsic evidence, including parol evidence, to ascertain what the parties intended on this score. *See Pinika*, 2008 WL ___ at *___. If the contract *were* ambiguous on this issue, the court stated, it might agree with Pinika that summary judgment is inappropriate. *Id.*

But Pinika's characterization of the contract as ambiguous with regard to the termination year was, and remains, untenable, for it would permit an interpretation of the contract that undermines another, clear and express provision. If a jury were permitted to find the parties intended to require MetLife to pay post-termination for documents that it "*would* have" tendered absent termination, that would eviscerate the Termination for Convenience provision. *Pinika*, 2008 WL ___ at *___. The provision allowing MetLife to terminate upon payment only of a limited, contractually fixed penalty would have no force if MetLife still had to pay as much as it would have during the remainder of the year if it had *not* exercised its right to terminate. That would violate the New York canon of

construction that every provision of a contract should be given effect. *Id.* (citations omitted). In contrast, MetLife's interpretation gave effect to all the terms of the agreement, and such an interpretation "'is preferable to one that ignores terms or accords them an unreasonable interpretation.'" *Pinika*, 2008 WL ___ at *___ (citations omitted).

In summary, the court held that (1) MetLife did not breach, because it gave the written notice and paid the termination fee required by the contract; and (2) MetLife was not obligated to pay for documents it would have been required to supply for imaging if the contract had continued, as that would be fundamentally inconsistent with the provisions expressly allowing MetLife to terminate on three months' written notice and payment of a certain fee. *Pinika*, 2008 WL ___ at *___.

## PINIKA'S MOTION FOR RECONSIDERATION

### DAMAGES

Pinika has never alleged that MetLife breached the contract with regard to Year One. The dispute centers only on Years Two and Three.

Pinika states that it is not seeking reconsideration of the court's determination that "MetLife's termination of the Agreement for 'convenience' in year three excused MetLife from its obligation to meet the Agreement's Minimum Annual Requirement in year three *after* the effective date of the termination . . . ." P's Mot. for Recon. at 1-2 (emphasis added). Rather, Pinika seeks reconsideration of the court's determination that MetLife did not breach as to Year Two (a full year under contract) and Year Three (a partial year before MetLife exercised its right to terminate "for convenience").

**With regard to Year Two**, MetLife has not denied that it did not tender the 1,000,000

documents required for imaging under the MAR.  It is undisputed that MetLife did not exercise its right to terminate the contract until several months into Year Three, so it is also undisputed that MetLife was obligated to abide by the contract for all of Year Two.  Correcting a palpable oversight in the summary-judgment opinion, the court agrees with Pinika and finds that MetLife tendered 294,844 documents fewer than the 1,000,000 documents required in Year Two, per the undisputed allegation in the sworn affidavit of Patrick Lemon.  *See* MSJ Ex 4 at 5 ¶ 13.[2]

The contract required MetLife to pay a Document Management Services fee of $0.13 (thirteen cents) per *image*.  MetLife contends that it should be liable for $0.13 *per document*, on the theory that a "document" is equivalent to an "image."  The court rejects this argument as contrary to the plain language of the contract.  The contract clearly provided that a "document" may be "one or more pages in length and *each one-sided page of a Document . . . shall constitute one image.*"  Agreement ¶ 36.17 (emphasis added).  Accordingly, MetLife's breach of the MAR for Year Two obligates MetLife to pay compensatory damages, before any applicable interest, fees, and costs, of $0.13 for each one-sided page of each document that it was required to tender in Year Two but did

---

[2]

This court will generally credit a factual allegation in a sworn affidavit if the opposing party fails to question its authenticity, admissibility, or veracity / accuracy.  *See, e.g., Fuelling v. New Vision Med. Labs., LLC*, 284 F. App'x 247, 250 (6th Cir. 2008) (Gilman, Cook. D.J. Cohn) ("Hymer's affidavit explained that employees had to make their own arrangements to the take the two required courses in the class, and that the black employee was the only one who actually signed up for them, *an assertion that Fuelling does not dispute*.");

*US v. Dailide*, 227 F.3d 385, 406 (6th Cir. 2000) ("affidavit is adequately footnoted, referring back to the documents on which he relied, and Dailide has not challenged . . . these citations.");

*US v. Any & All Radio Transmission Equip.*, 218 F.3d 543, 549 (6th Cir. 2000) (accepting statements in affidavit, noting, "Perez does not contest any of the facts alleged in the affidavit . . . .");

not.

Again, it is undisputed that in Year Two, MetLife tendered 294,844 documents fewer than the 1,000,000 documents required. Pinika alleged, and continues to allege, without contradiction from MetLife, that in the documents which Pinika provided to Paladigm in Years One and Two, there was an average ratio of 2.3 images per document, *see* Pinika's Mot. for Recon. at 5, and the court so finds. Absent some other proposed method of calculating how many images the "missing" Year Two documents would have contained, the court accepts Pinika's method as the most rational and least speculative method available.

Applying the ratio of 2.3 images per document, the court finds that if MetLife had tendered the additional 294,844 documents required in Year Two, those additional documents likely would have contained an additional 294,844 x 2.3 = 678,141 images.

At the contract price of $0.13 per image, the court finds that MetLife owes Pinika 678,141 x $0.13 = $88,158.33 in unpaid document management service fees for Year Two of the contract. This figure for Year Two damages does not include any applicable prejudgment interest, post-judgment interest, fees, or costs, that may be justified by the contract or by state law (for prejudgment interest) or federal law (for postjudgment interest).

**As to Year Three of the contract**, Pinika complains that in the months of Year Three before MetLife exercised its right to terminate the contract, MetLife tendered only 347,000 documents for imaging rather than the 1,000,000 documents required by the contract's MAR. For the reasons stated by the court's summary-judgment opinion, the court adheres to the determination that this did not constitute a breach by MetLife. Whether in opposition to summary judgment or in support of its reconsideration motion, Pinika has never identified any provision of the contract which required

MetLife to render any particular number of documents or images for imaging per day, per week, per month, or per quarter. By its terms, the agreement required only that MetLife tender 1,000,000 documents for imaging in and by the end of *each full year the contract was in effect*. In other words, if a full year passed under the contract with a valid termination by either party, MetLife was obligated to tender 1,000,000 documents by the end of that year, but it could tender them at any time during that year – even on the last day of the year – without violating the contract. By properly exercising its absolute contractual right to terminate the agreement "for convenience", MetLife validly abrogated its obligation to meet Year Three's Minimum *Annual* Document Requirement.

**Pinika has one more argument for reconsideration with regard to Year Three of the contract. This argument has merit.** Pinika alleges the following, without persuasive contradiction by MetLife:

(1) in Year Three, MetLife tendered 347,000 documents for imaging by Paladigm (the "Year Three Tendered Documents");

(2) MetLife paid Paladigm only $13,390.00 in document management service fees for the images contained in those 347,000 documents;

(3) because each document necessarily contained at least one image, MetLife should have paid *at least* 347,000 documents  x  1 image/document  x  $0.13/image = $45,100.00; and

(4) therefore, even if each documented tendered in Year Three contained only one image, MetLife still owes $45,100.00 minus the $13,390.00 previously paid to Paladigm = $31,721.00.

The court adopts each of these factual allegations and legal contentions by Pinika.

As explained above, the contract required MetLife to pay $0.13 *per image*, not $0.13 *per document*. The record, however, does not appear to show the number of images actually contained in the 347,000 documents which MetLife actually tendered for imaging during Year Three prior to

termination. The parties have a choice: they may either examine those 347,000 Year Three Tendered Documents and count how many images they contained, or they can let the court make a finding.

If the parties let the court resolve this issue, the court will assume and find that the 347,000 Year Three Tendered Documents contained an average of 2.3 images per document, for a total of 798,100 images. In that event, MetLife's Year Three liability would be 798,100 images x $0.13/image = $103,753 in fees. Subtracting the $13,390.00 which MetLife paid to Paladigm for the 347,000 Year Three Tendered Documents, MetLife would owe $90,363 in fees therefor (exclusive of any applicable pre-judgment interest and post-judgment interest).

## INTEREST

When a federal court enters a judgment for monetary damages on a state-law claim, "federal law controls post-judgment interest but state law governs awards of prejudgment interest." *ECM Converting Co. v. Corrugated Supplies Co., LLC*, 2009 WL 385549, *4 (W.D. Mich. Feb. 13, 2009) (Paul L. Maloney, C.J.) (quoting *Estate of Riddle v. So. Farm Bur. Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005) (citing, *inter alia*, *FDIC v. First Heights Bank*, 229 F.3d 528, 542 (6th Cir. 2000))).[3]

This rule applies even where, as here, the plaintiff originally filed the case in state court, it arrived here only by removal, and there was no federal-question jurisdiction, i.e., no part of the

---

[3]*Accord Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 146 (1st Cir. 2009) ("It is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court, while post-judgment interest, even on state-law claims, is governed by federal law..") (citing *Blockel v. J.C. Penney Co., Inc.*, 337 F.3d 17, 29 (1st Cir. 2003) and *Conway Electro Switch Corp.*, 825 F.2d 593, 602 (1st Cir. 1987), and *Cummings v. Standard Register Co.*, 265 F.3d 56, 68 (1st Cir. 2001), respectively).

judgment consists of damages on a federal-law claim. *See Chouinard v. KinderCare Learning Ctrs., Inc.*, 2008 WL 913322, *3 (M.D. Tenn. Mar. 31, 2008) (Juliet Griffin, M.J.) (after approving unopposed request for award of *pre*-judgment interest at Tennessee state statutory rate of 10%, court remarked, "To the extent that the plaintiff seeks *post*-judgment interest at the same rate of ten percent, the request is denied. Post-judgment interest on all judgments entered in federal courts is determined in accordance with 28 U.S.C. § 1961, even if the case was originally filed in state court and even if jurisdiction is based on diversity.").

> The federal post-judgment interest statute provides, in pertinent part,
>
> Interest *shall* be allowed on any money judgment in a civil case recovered in a district court. * * * Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors for the Federal Reserve System, for the calendar week preceding the date of judgment. * * *

28 U.S.C. § 1961(a) (emphasis added). As the word "shall" suggests, post-judgment interest under this statute is mandatory. *Law v. BioHeart, Inc.*, 2009 WL 693149, *19 (W.D. Tenn. Mar. 13, 2009) (Bernice Donald, J.) (citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002)).

Because this court could and should have entered judgment for Pinika as to Year Two at the time of the original decision on MetLife's summary-judgment motion, the Amended Judgment which ultimately issues in this case will relate back to the date of that decision *for purposes of federal statutory post-judgment interest*. In other words, Pinika is entitled to post-judgment interest from the date of the partially-erroneous summary-judgment opinion, because it was only this court's error regarding Year Two which deprived Pinika of judgment on Year Two from that time until the instant grant of reconsideration. *Cf. Am. Seating Co. v. Kawahara Design, Inc.*, 2009 WL 500808, *2 (W.D. Mich. Feb. 26, 2009) (Maloney, C.J.) (granting motion to enforce settlement and entering

judgment in favor of plaintiff, but ordering defendant to pay § 1961 post-judgment interest from the date of the settlement nearly three months earlier).

"Interest shall be computed daily to the date of payment except as provided in [28 U.S.C. § 2516(b)] and [31 U.S.C. § 1304(b)], and shall be compounded annually." 28 U.S.C. § 1961(b). For daily interest rates from Monday, March 30, 2009 through Sunday, April 5, 2009, the week which includes the date on this judgment was issued, the parties are referred to http://www.federalreserve.gov/releases/h15/20090330 ("Federal Reserve Statistical Release, H. 15 Selected Interest Rates" released at 2:30 p.m. on Monday, March 30, 2009).

Finally, post-judgment interest shall be calculated not only on the compensatory damages, but on the sum of those damages plus any state-law prejudgment interest. *See, e.g., City of Owensboro v. Ky. Utils. Co.*, 2009 WL 424996, *1 (W.D. Ky. Feb. 19, 2009) (Joseph H. McKinley, Jr., J.) ("Judgment will be entered . . . in the amount of . . . together with prejudgment interest at 8% [under Kentucky law] . . . and postjudgment interest *on the entire amount of the judgment, including interest*, at the rate prescribed by 28 U.S.C. § 1961 . . . .") (emphasis added).[4]

## ORDER

Plaintiff's reconsideration motion [doc. # 46] is **GRANTED in part** & **DENIED in part**.

---

[4]

If the defendant wishes to propose paying the judgment in installments, the court advises the parties that "[p]ursuant to Fed. R. Civ. P. 69[(a)(1)], the procedure in proceedings supplemental to and in aid of a money judgment 'must accord with the procedure of the state where the court is located.'" *Patel v. Garmo*, 2009 WL 279034, *1 (W.D. Mich. Feb. 5, 2009) (Quist, J.) (citing *Ins. Co. of No. Am. v. Dynamic Const. Co.*, 1995 WL 7956, *2 (6th Cir. Jan. 5, 1995) (applying installment-payment provisions of Michigan Revised Judicature Act and Michigan Court Rules in a diversity case)). If MetLife proposes installment payments, the parties should consult MICH. CT. R. 3.104 and MICH. COMP. LAWS § 600.6201. *See Patel*, 2009 WL 279034 at *1-2.

<u>Plaintiff's reconsideration motion is granted to the following extent:</u>

**The court HOLDS that MetLife breached the contract with regard to Year Two** by failing to tender one million documents for imaging during Year Two.

**For Year Two, MetLife SHALL PAY to Pinika $88,158.36** in unpaid document management service fees, plus any applicable pre-judgment interest under state law.

**The court HOLDS that MetLife breached the contract with regard to Year Three** by failing to pay at least $0.13 for each of the 347,000 documents which it tendered to Pinika for imaging during the pre-termination portion of Year Three.

**The parties SHALL CONFER** and, no later than Friday, May 29, 2009, they shall jointly file a notice that either (1) states the actual number of images contained in the 347,000 Year Three Tendered Documents and calculates the fees due therefor or (2) states that the parties accept $90,3633 as the amount of fees owed but not paid by MetLife with regard to the Year Three Tendered Documents (exclusive of interest, fees, and costs).

The parties' notice **SHALL** jointly propose – and separately explain and justify, with calculations and citations to authority – the amounts which MetLife should pay as:

– state-law pre-judgment interest on the $88,158.36 in Year 2 damages;

– federal-law post-judgment interest on the $88,158.36 on the sum [Year 2 damages + pre-judgment interest]

– state-law pre-judgment interest on the sum [Year 3 Tendered Documents damages];

– federal-law post-judgment interest on the sum [Year 3 Tendered Documents damages + pre-judgment interest];

– contractual or statutory attorney's fees and costs, if any.

<u>Plaintiff's reconsideration motion is denied to the following extent:</u>

The court adheres to its prior determination that MetLife did not breach the contract by failing to tender 1,000,000 documents for imaging for Year Three.[5]

This is <u>not</u> a final and appealable order, because damages have not yet been ascertained with certainty. *See SEC v. Smith*, 95 F. App'x 148, 150 (6th Cir. 2004) ("Generally, a judgment is not a 'final decision' for purposes of [28 U.S.C.] § 1291 'when the assessment of damages remains.'") (quoting *Woosley v. Avco Corp.*, 944 F.2d 313, 316, (6th Cir. 1991) (citing *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976))); *Gnesys, Inc. v. Greene*, 437 F.3d 482, 487-88 (6th Cir. 2005) (fact that attorney fees have not yet been calculated does not prevent immediate appeal from award of damages, but an order is not final if it does not fix the amount of damages exclusive of such fees).

**IT IS SO ORDERED this 31st day of March 2009.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
United States District Judge

---

[5] *Cf. Weidauer v. Broadspire Servs., Inc.*, 2009 WL 152501, *6 (S.D. Ohio Jan. 21, 2009) (Thomas Rose, J.) ("(The Court has not been given the information by the parties to make this calculation and will, therefore, leave the calculation of prejudgment interest due to Weidauer to the Parties to accomplish within the next thirty (30) days.").