_____|

PINIKA, LLC,                               |    Case No. 1:07-cv-826
                                           |
            Plaintiff,                     |    HONORABLE PAUL MALONEY
                                           |
            v.                             |    Magistrate Judge Carmody
                                           |
METLIFE, INC.,                             |
                                           |
            Defendant.                     |
_____|

### Opinion and Order

**Granting in Part and Denying in Part the Defendant's Motion for Reconsideration:**

Defendant Breached Contract by Failing to Tender One Million Documents in Year 2;
Year 2 Un-Tendered Document Damages are Calculated at an Assumed 2.3 Images Per Doc.

Defendant Did Not Breach for Year 3 by Failing to Tender 1,000,000 Documents, but
Defendant May Have Breached by Failing to Pay Fees Due for Documents Tendered in Year 3;
Year 2 Tendered-but-Unpaid Doc. Damages are Calculated at an Actual 2.4 Images Per Doc.

**Directing the Parties to Ascertain and Agree on Amount MetLife Paid in Year Three
Directing Parties to Jointly Calculate Damages & Interest for Years 2 and 3**


This is a diversity breach-of-contract action between Pinika LLC ("Pinika") and MetLife,

Inc. ("Met"). This court originally granted Met's motion for summary judgment, *see Pinika, LLC*

*v. Met, Inc.*, 2008 WL _____ (W.D. Mich. _____, 2008) (Maloney, J.) ("*Pinika 2* ").

Plaintiff Pinika timely filed a motion for reconsideration, which the court granted in part and

denied in part. The court granted reconsideration to Pinika on two issues, holding that defendant

Met breached the contract in two ways: (1) by failing to tender one million documents for imaging

-1-

in Year 2, and (2) by failing to pay some of the fees due for documents which it actually tendered in Year 3. The court adhered, however, to its earlier determination that Met did not breach the contract by failing to tender one million documents for imaging in Year 3. The court directed the parties to confer and calculate the damages and interest which Met owes to Pinika. *See Pinika, LLC v. Met, Inc.*, 2009 WL 891723 (W.D. Mich. Mar. 31, 2009) (Maloney, C.J.).

On April 14, 2009, defendant Met moved for reconsideration of the March 31, 2009 order. As ordered by the court in *Pinika 3* on April 24, 2009, plaintiff Pinika filed an opposition brief in May and defendant Met filed a reply brief in June. For the reasons that follow, the court will largely deny defendant Met's motion for reconsideration. The court grants Met's motion only to the extent needed to correct a mathematical error which the parties made in previous briefs regarding the number of documents Met actually tendered for imaging in Year 2 of the three-year contract.


**BACKGROUND**

Paladigm Systems, LLC ("Paladigm") – which the court found to be Pinika's predecessor with regard to the Met contract, *see Pinika*, 2008 WL ___ at *__ – developed and owned proprietary software for document imaging, archiving, retrieval, and tracking, and provided web-hosting, implementation, processing, and operation services for document-management systems. *Id.* at *____. In June 2000, the parties discussed Met's need for information retrieval services, and Met asked Paladigm to develop a system to meet its needs, and Paladigm did so. *Id*.

Pinika's document-retrieval software was originally designed for a database organized document-by-document, but in response to Met's requests, Pinika modified it to accommodate information derived from separate documents with different dates "and distinct significance . . . ."

*Pinika*, 2008 WL at \*_____.  It proposed an application allowing "users to scroll through a document, view number of pages within a document," and offered to prepare documents for imaging by removing staples, paper clips, "sticky notes", and other impediments to scanning.  *Id.* at \*_____.

In February 2001, Met and Paladigm entered into an agreement wherein Paladigm agreed to provide services for the "implementation, processing and operation of a document management system", and Met agreed to provide "a minimum annual requirement ["MAR"] of 1,000,000 Documents . . . ."  *Pinika*, 2008 WL at \*_____ (quoting ¶ 2.2(a)).  It specified that "[f]or the sake of clarity, 'document' may be one or more pages in length and each one-sided page of a Document which is digitized hereunder shall constitute one image."  *Id.* at \*_____ (citing § 36.17).

In the first full calendar year, 2001, Met satisfied the 1,000,000-document MAR, but in years two and three, it provided only 294,844 and 853,541 documents, *id.* at \*_____ – a total of 1,148,385 documents rather than the 2,000,000 documents which Pinika *correctly* contended were required.

In the documents which Met did provide to Paladigm, there was an average 2.3 images per document.  Applying that ratio, Pinika logically reasoned that if Met had tendered the additional 851,615 documents, they likely would have contained an additional 678,141 images in year two, and an additional 1,963,144 images in year three.[1]  *Pinika*, 2008 WL at \*_____.

Paragraph 2.1(b) required Met to pay $0.13 per image, so if Met had tendered documents containing those additional 2,641,285 images in years two and three, it would have paid an additional $343,367.  *Id.* at \*_____ (citing Agreement ¶ 2.1(b) and Damage Calculations).

---

[1]

In year two, an additional 294,844 documents containing 2.3 images each would have yielded 678,141.2 additional images.

In year three, an additional 853,541 documents containing 2.3 images each would have yielded 1,963,144.3 additional images.

By letter dated January 7, 2003, Met informed Paladigm that it was ending the agreement effective May 7, 2003. *Pinika*, 2008 WL at *____. Agreement § 11.10, Termination for Convenience, authorized Met to terminate the Agreement "and/or any of the Services being provided under this Agreement at any time for the convenience of CLIENT [Met] by giving PALADIGM at least three (3) months' prior written notice designating the termination date."

Met paid Paladigm a $9,720 contractual early-termination fee. *Id.* at *____.

In addition, in July 2003, Met paid $13,390 to defray document-management fees. *Id.*

Pinika maintained that the Termination provision did not excuse Met from its obligation to provide one million documents per year, for the remainder of the full contract term, as required by ¶ 2.2(a), *id.* at *____, and its motion for reconsideration unpersuasively re-argued the point.

Paladigm's assets, contractually defined to include receivables due from Met, were validly transferred to Pinika's predecessor in 2005. *Pinika*, 2008 WL at *____. (That eliminated a possible basis for granting summary judgment to Met as to all years. Met has not asked for reconsideration of that determination.)

Pinika sued Met in Michigan state court, asserting New York common-law claims for breach of contract and breach of the covenant of good faith and fair dealing, and seeking recovery of $343,367.22, plus interest, pursuant to § 2.1(f), and Met removed. *Pinika*, 2008 WL at *____. Met's answer contended that Pinika's claims failed because there was no privity of contract; were barred by the Statute of Frauds and the statute of limitations; failed to state a claim on which relief can be granted; were barred by payment and/or release and by waiver and estoppel. Met did not counterclaim and did not contend that Pinika breached. *Id.* at *____.

# THE GRANT OF SUMMARY JUDGMENT TO MET

The court initially held that, under a proper interpretation of the contract, Pinika failed to show any genuine issue as to whether Met breached the contract as to any time period:  it did not. (As discussed below, the court was correct as to Year Three but mistaken as to Year Two.)

As to Year Three, Pinika essentially contended that Met was liable for the amount  Paladigm would have been contractually entitled to charge *if* the contract had continued for the remainder of the originally-contemplated term (another nine months) and Met had tendered the minimum documents required.  Pinika reasoned that because the contract does not expressly relieve Met of the obligation to provide 1,000,000 documents for imaging each year during the entire originally-contemplated term, Met was still bound by that obligation notwithstanding its valid termination of the contract nine months "early."  Pinika argued as follows,

> *Met notified Paladigm that it was terminating . . . pursuant to section 11.10 of the parties' Agreement*.  Contrary to Met's contention, this section does not excuse defendant from its obligation to meet the Minimum Annual Requirements mandated by ¶ 2.2(a) . . . or otherwise provide for any prorating thereof. [Ex 1 at 5]  Section 11.10 . . . only address[es] unpaid Hosting & Maintenance Fees.  *It is silent about Document Imaging charges unlike § 11.2 which discusses both types of charges*.

> Moreover, ¶ 11.7 ("Obligations prior to Termination/expiration"), provides, in part, "Except as set forth in this Agreement, termination or expiration of this Agreement shall not relieve either party of any obligation, charge, fee, or expense payable under this Agreement which accrued on or prior to the effective date of termination or expiration." [Ex. 1 at 13]

> Therefore, it is reasonable to conclude that if the parties intended that the [MAR] would not be excused since no such provision is included in § 11.10.  11.2 clearly states that Met will have to pay the Minimum if it breaches the contract.  These two points demonstrate that the Minimum was an iron clad point in the deal.  * * *

> Defendant's argument that it is not required to make payment, under the minimum annual document requirement, for year three of the contract because it was terminated is without merit, because the contract, by its express language, speaks to the obligations of the parties upon termination, and nowhere states that the annual

minimum document requirement is terminated upon the termination of the agreement.

By way of example, the contract provides in ¶ 11.11 <u>Consequences of Expiration/Termination</u> . . . [Ex. 1 at 14], for various obligations of the parties upon termination, but does not speak to the termination of the [MAR].

* * *

Further the contract expressly provides under ¶ 27, <u>Obligations Which Survive Termination</u>:

> Any provision of this Agreement which contemplates performance . . . subsequent to any termination or expiration of this Agreement shall <u>survive</u> the termination or expiration of this Agreement and continue in full force and effect. [Ex. 1 at 24]

According to the preceding language, Met's obligation to supply the [MAR] of one million documents was obviously a requirement that would survive termination because of the enormous level of effort and expense required of Paladigm to provide the ongoing services called for by the Agreement. The parties' omission of any reference to eliminate this requirement must be given great weight.

*Id.* at * ___ (quoting Pinika's Opp to SJ at 10-11 (emphasis added by Pinika)).

After considering § 11 (Termination) and § 27 (Obligations Which Survive Termination) and New York's canons of construction, the court rejected Pinika's argument as a matter of law.

First, the court concluded that § 27, Obligations Which Survive Termination, was of no avail to Pinika directly or indirectly. That section merely states that any provision which contemplates post-termination performance shall survive termination, which begged the question: *which* provisions "contemplate" post-termination performance? Pinika did not identify any provision which a reasonable factfinder could find contemplated post-termination performance of ¶ 2.2(a)'s duty to tender at least 1,000,000 documents per year to Paladigm for imaging.

Second, Pinika was correct that, under certain circumstances, § 11.2 required Met to compensate Paladigm for the revenue that Paladigm would have earned under the MAR. But this was of no avail to Pinika on the undisputed material facts. The contract provided, in pertinent part,

11.1   <u>Termination of Agreement</u>.  The parties may terminate this Agreement prior to the expiration of the Initial Term or a Renewal Term, if any, as follows:

(a) *PALADIGM shall have the right to terminate this Agreement upon notice to CLIENT for cause if: . . . (iii) CLIENT materially fails to perform* or observe any of its obligations hereunder and such failure is not remedied within thirty (30) calendar days, except as otherwise provided herein, after written notice to CLIENT specifying such material failure.

\* \* \*

11.2 <u>PALADIGM's Remedies</u>.  *If PALADIGM terminates this Agreement pursuant to Section 11.1(a),* then in addition to all other rights and remedies of law or equity or otherwise, *PALADIGM shall be entitled to recover promptly from CLIENT*: (I) all amounts due under this Agreement for the period to and including the effective date of termination, including, but not limited to, any unpaid Hosting & Maintenance Fees, and (ii) *the amounts due for Document Management Services for the then-current annual term,* which amount shall be the remaining balance of the Minimum Annual Requirement multiplied by $0.13.

*Pinika*, 2008 WL ____ at \*___ (quoting Comp Ex 1 at 11-12 (emphasis added)).  Pinika contended that because § 11.2 requires Met to pay the amount it would have paid for 1,000,000 documents for the rest of the year of termination, we can infer that "the Minimum was an iron clad point in the deal." *Id.* at \*___.  But § 11.2 did not support, let alone compel, such a broad inference.  It required Met to pay for the requirement for the rest of the year *<u>only when Paladigm terminated due to an uncured breach of contract by Met</u>*.  Neither § 11.2, nor any other provision, expressly requires Met to compensate Paladigm for the requirement for the remainder of the termination year when the termination was for any reason other than Met's uncured breach.  *Id.* at \*___

In fact, § 11.2 supported *Met's* position.  Section 11.2 showed that when the parties wished to require Met to pay for the unfulfilled portion of the requirement during the remainder of the year of termination, they knew how to do so and did so explicitly.  The court inferred from the absence of such a requirement that the parties did not intend such a requirement to apply.  That is, they did not intend to hold Met liable for revenue loss attributable to documents that it *would have been*

required to tender for imaging *if* it had not exercised its right to terminate the contract.

*Village of Freeport*, 2007 WL 4532420 (N.Y. S.Ct. Nassau Cty. Dec. 12, 2007) illustrated the New York canon of construction which supported this interpretation. The Village sued Turner for breach of contract, and Turner moved to compel arbitration. The contract's components were Procurement General Conditions, Procurement Supplementary Conditions, and Modifications to Procurement General Conditions. *Id.* at *1. The Supplementary Conditions began, "These Supplementary Conditions amend or supplement the Procurement General Conditions . . . . All Conditions which are not so amended or supplemented remain in full force and effect." *Id.* at *2.

Gen. Conditions Article 15.1 required arbitration of all disputes "arising out of or relating to the Procurement documents or the breach thereof." *Pinika*, 2008 WL ___ at *__ (citing *Freeport*, 2007 WL 4532420 at *2). Gen. Conditions Article 16 provided that if the Procurement Documents conflicted with state or municipal law, the state or municipal law would prevail. Supp. Condition 16 provided that if a dispute arises, Owner and Supplier agreed to submit to the jurisdiction of the courts of Nassau County, NY. *Id.* The Village contended that Supp. Condition 16's submission to state-court jurisdiction negated Gen. Condition 15's agreement to arbitrate certain disputes. The court rejected the Village's argument as contrary to New York's established rules of construction:

> A sound principle of contract interpretation requires that the court "give effect to the intent of the parties as revealed by the language and *structure* of the contract." (Emphasis supplied.) *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914 ([N.Y. App. Div.] 4th Dept. 1996). To do so, the court must examine the document "as a whole", give effect and meaning to every term", and make a reasonable effort to "harmonize all of its terms." *Id.* at 914-15. * * *

> * * * The Village reads the Supplementary Condition too broadly and "in isolation from the remainder of the agreement." *Reda v. Eastman Kodak Co.*, supra. The result is that the Village's interpretation does not give effect to the arbitration provisions, and renders them meaningless. Nor does the Village make any effort to harmonize the provisions of arbitration for Procurement disputes with the provisions

-8-

for litigation of disputes concerning the statute and ordinances of New York and its subdivisions. Nor does the Village consider the structure of the Procurement Documents and the manner in which specific sections are modified or supplemented. It also ignores the specific declaration that those provisions, which are not modified, remain in full force and effect.

\* \* \*

*Moreover, the very structure utilized by the Village to supplement the General Conditions, i.e., by tying the Supplement to a specific article or section, indicates that the jurisdictional supplement expressly was intended not to affect the arbitration provisions of Article 15. To do so, it would have specifically stated that i[t] was intended to supplement Article 15, rather than Article 16. Certainly, when it was the intent of the Village to delete a provision, it knew how to do so. For example, Supplementary Condition 6.2, regarding progress payments, expressly provides for deletion of "paragraph 6.2.1 of the Procurement General Conditions in its entirety." Such language could have been employed to delete Article 15 in whole or part, if that was the Village's intent.*

*Pinika*, 2008 WL ___ at *__ (quoting *Freeport*, 2007 WL 4532420 at *3) (nn. & citations omitted).

Pinika painted the contract as ambiguous regarding whether Met is obligated to pay compensation – beyond that expressly required – for the revenue that Pinika lost as a result of Met's termination. In light of such ambiguity, Pinika contended, New York law requires the court to examine extrinsic evidence, including parol evidence, to ascertain what the parties intended on this score. *See Pinika*, 2008 WL ___ at *___. But Pinika's characterization of the contract as ambiguous with regard to the termination year was untenable, for it would permit an interpretation of the contract that undermines another, clear and express provision. If a jury were permitted to find the parties intended to require Met to pay post-termination for documents that it "*would* have" tendered absent termination, that would eviscerate the Termination for Convenience provision. *Pinika*, 2008 WL ___ at *___. The provision allowing Met to terminate upon payment only of a limited, contractually fixed penalty would have no force if Met still had to pay as much as it would have during the remainder of the year if it had *not* exercised its right to terminate. That would have violated the New York canon of construction that every provision of a contract should be given

effect.  *Id.* (citations omitted).  In contrast, Met's interpretation gave effect to all the terms of the agreement, and such an interpretation "'is preferable to one that ignores terms or accords them an unreasonable interpretation.'"  *Pinika*, 2008 WL ___ at *___ (citations omitted).

In summary, the court held that (1) Met did not breach, because it gave the written notice and paid the termination fee required by the contract; and (2) Met was not obligated to pay for documents it would have been required to supply for imaging if the contract had continued, as that would be fundamentally inconsistent with the provisions expressly allowing Met to terminate on three months' written notice and payment of a certain fee.  *Pinika*, 2008 WL ___ at *___.

## PINIKA'S MOTION FOR RECONSIDERATION:  DAMAGES

Pinika never alleged that Met breached the contract with regard to Year One.  The dispute has always involved only on Years Two and Three.

Pinika did not challenge the determination that "Met's termination of the Agreement for 'convenience' in year three excused Met from its obligation to meet the Agreement's Minimum Annual Requirement in year three *after* the effective date of the termination . . . ."  Rather, Pinika sought reconsideration of the determination that Met did not breach as to Year Two (a full year) and Year Three (a partial year before Met exercised its right to terminate "for convenience").

**With regard to Year Two**, Met did not deny that it did not tender the 1,000,000 documents required for imaging under the MAR.  It was undisputed that Met did not exercise its right to terminate the contract until several months into Year Three; therefore, it was also undisputed that Met was obligated to abide by the contract for all of Year Two.  Correcting a palpable oversight in the summary-judgment opinion, the court agreed with Pinika and found that Met tendered 294,844

documents fewer than the 1,000,000 documents required in Year Two.

The contract required Met to pay a fee of $0.13 (thirteen cents) per *image*. Met contended that it should be liable for $0.13 *per document*, on the theory that a "document" is equivalent to an "image." The court rejected this argument as contrary to the plain language of the contract. The contract clearly provided that a "document" may be "one or more pages in length and *each one-sided page of a Document . . . shall constitute one image*." Agreement ¶ 36.17 (emphasis added). Accordingly, Met's breach of the MAR for Year Two obligated Met to pay compensatory damages, before any applicable interest, fees, and costs, of $0.13 for each one-sided page of each document that it was required to tender in Year Two but did not tender.

Again, it was undisputed that in Year Two, Met tendered 294,844 documents fewer than the 1,000,000 documents required. Pinika alleged, without contradiction from Met, that in the documents which Pinika provided in Years One and Two, there was an average ratio of 2.3 images per document, and the court so found. Absent some other proposed method of guessing how many images the "missing" Year Two documents would have contained, the court accepted Pinika's method as the most rational and least speculative method available.

Applying the ratio of 2.3 images per document, the court found that if Met had tendered the additional 294,844 documents required in Year Two, they likely would have contained an additional 294,844 x 2.3 = 678,141.2 images.

At the contract price of $0.13 per image, the court found that Met owes Pinika 678,141.2 x $0.13 = $88,158.36 in unpaid fees for Year Two. This figure for Year Two damages does not include any prejudgment or post-judgment interest, fees, or costs, that may be authorized by the contract or by state law (for prejudgment interest) or by federal law (for postjudgment interest).

**As to Year Three of the contract**, Pinika complained that in the months of Year Three before Met exercised its right to terminate, Met tendered only 347,000 documents for imaging rather than the 1,000,000 required by the contract's MAR.  For the reasons stated by the court's summary-judgment opinion, the court adhered to the determination that this did not constitute a breach by Met.

**Pinika had one more argument for reconsideration with regard to Year Three.  That argument had merit.**  Pinika alleged the following, without persuasive contradiction by Met:

(1)     in Year Three, Met tendered 347,000 documents for imaging by Paladigm (the "Year Three Tendered Documents");

(2)     Met paid Paladigm only $13,390.00 in document management service fees for the images contained in those 347,000 documents;

(3)     because each document necessarily contained at least one image, Met should have paid *at least* 347,000 documents x 1 image/document x $0.13/image = $45,100.00; and

(4)     therefore, even if each documented tendered in Year Three contained only one image, Met still owes $45,100.00 minus the $13,390.00 previously paid to Paladigm = $31,721.00.

The court adopted each of these factual allegations and legal contentions by Pinika.

As explained above, the contract required Met to pay $0.13 *per image*, not $0.13 *per document*.  The record, however, did not show the number of images actually contained in the 347,000 documents which Met tendered for imaging during Year Three prior to termination.  The court gave the parties a choice:  examine those 347,000 Year Three Tendered Documents and count how many images they contained, or let the court estimate.  The court advised the parties that if they let the court resolve this issue, the court would assume that the 347,000 Year Three Tendered Documents contained an average of 2.3 images per document, for a total of 798,100 images.  In that event, Met's Year Three liability would be 798,100 images x $0.13/image = $103,753 in fees.

Subtracting the $13,390.00 which Met paid to Paladigm for the 347,000 Year Three Tendered Documents, Met would owe $90,363 in fees therefor (exclusive of interest).

## DEFENDANT MET'S CURRENT MOTION FOR RECONSIDERATION

Met seeks reconsideration of this court's decision which partially granted and partially denied Pinika's reconsideration motion. Met does not challenge the court's liability determinations. It challenges only the court's estimation of damages for Year Two.

First, Met challenges the court's assumption that the Year Two Non-Tendered Documents contained an average of 2.3 images per document. Met asserts that this assumption rests on parol evidence, which may not be consulted when the contract is unambiguous. *See* Met Recon. Mot. at 2. Met's argument on this issue begins by stating:

> The court found that MetLife breached the contract in Year Two by failing to tender 294,844 documents for service. Pursuant to the plain language of Section 36.17 of the Agreement, "Documents" were defined as:
>
> > 36.17 "Documents" shall mean any and all documents provided to PALADIGM by CLIENT for Document Management Services under this Agreement. For the sake of clarity, a "Document" may be one or pages in length and each one-sided page of a Document which is digitized hereunder shall constitute one image.
>
> Thus, according to the unambiguous agreement MetLife could have plausibly submitted 294,844 documents which were a one-sided page containing one image. If this were the case the total damages owed for Year Two should be $38,329.72. The court provides no explanation for adopting the Plaintiff's spurious historical data calculation that damages should be calculated at the rate of 2.3 images per document.

Met's Recon. Mot. at 3-4 (footnotes 11-13omitted). MetLife goes on to argue that the court will be impermissibly consulting parol evidence if it continues to assume that additional documents tendered would have conformed to the historical average of 2.3 images per document. MetLife writes:

It appears from the holding that the Court misconstrued MetLife's position wherein it held:

> MetLife contends that it should be liable for $0.13 *per document*, on the theory that a "document" is equivalent to an "image." The Court rejects this argument as contrary to the plain language of the contract.
>
> Opinion at p. 1, ¶ 2, Docket Entry No. 59.

This is a misstatement of MetLife's position. It is not MetLife's argument that a document is synonymous with one image. However, it is MetLife's position that a document may contain only one image. In other words, a document may be a one[-]sided page which is submitted for service. A one[-]sided page contains only one image[,] which according to the plain language of the contract is serviced at the rate of $0.13. There is nothing in the contract which barred the production of documents containing only one image, indeed this is the minimum number of images a document may contain. Thus, the $0.13 charge for a one-sided, one[-]page document which contains one image is the appropriate measure of damages, if any [sic].

Significantly, the Court does not address the fact that if the Defendant had tendered 294,844 one-sided, one[-]page documents during Year Two, it would have been within its contractual rights. The payment for these documents would have been charged at the rate of $0.13 per document[,] equaling $38,329.72. Historical data calculations in this case are even more baffling when the court considers that MetLife tendered less than two years worth of documents upon which such calculations could be based.

The Court, in its Opinion[,] failed to address the fact that the Plaintiff based its original argument regarding the historical data calculations on parole [sic] evidence. However, there is no plausible legal argument for adopting parole [sic] evidence to determine the number of images that comprise a document. This is outlined by definition in the written agreement in the case. Parole [sic] evidence and course of dealing may only be used to resolve ambiguity in the terms of a contract. [citations to N.Y. and 2d Cir. omitted] There is no ambiguity in this contract[;] it plainly states that a document may be [a] one-sided page and that one-sided page contains one image. As such, the remaining documents should be calculated at $0.13 per document.

The court may not ignore this fact [sic] in favor of speculation, indeed the Court is barred from speculating about damages. [citation omitted] * * *

MetLife requests that if the Court calculates any damages for Year Two, it reconsider its formulation and adopt a calculation which favors the minimum number of documents and images which would have been required by the Agreement.

-14-

Met's Recon. Mot. at 4-6.   Even with this "clarification", MetLife's argument remains illogical.

Met continues to misapprehend the court's simple rationale for adopting the figure of 2.3 images per document:  first, the contract fails to specify how to calculate damages in the event that Met failed to tender the number of documents required by the contract; second, Met provides no particular reason to believe that the additional documents it should have tendered would systematically contain fewer images per document than the 2.6 million-plus documents it actually tendered; and third, the actual life-of-the-contract average of 2.3 images per document is the most sensible and *least speculative* method available

 It is disingenuous for Met to keep reciting its mantra that "the contract is not ambiguous" when it comes to damages.  Repetition and indignance are poor substitutes for logic.  The contract is unambiguous in its definition of a document alright – "a 'Document' may be one or more pages in length and each one-sided page of a document . . . shall constitute one Image" – but it certainly does <u>not</u> say that a document always contains a set number of pages or images.  And nowhere does it specify or suggest how many images an un-tendered document should be deemed to have in the event that Met breached by failing to tender the MAR of 1,000,000 documents.  Met's counsel could have negotiated such a provision when they drew up the contract, but they did not.

Moreover, Met maintains "It is not MetLife's argument that a document is synonymous with one image."  If Met's position is something different than that, it is a distinction without a difference.  Met wants the court to assume that every single additional document it would have submitted, would have been a one-sided, one-page document, and therefore would have contained ... *one image*.

Met complains that it is "speculative" to assume that the additional documents would have contained about the same number of images per document as the documents that were actually

tendered. Yet Met would have the court assume that each and every additional document would have contained only one image. That approach would flout the New York courts' directive to avoid or minimize speculation when calculating damages. It would be no more speculative to assume that the additional documents submitted by Met would have contained, say, *four* images each; after all, the contractual provision defining "document" and "image" left open the possibility that they would have done so.

Finally, Met asserts that the historical average (images per document) is drawn from too small a sample – "less than two years worth of documents", Met says. This is an odd claim given that the contract lasted two years and four months before termination. In any event, the historical average adopted by the court is derived from the parties' actual conduct and experience during the *entire* life of the contract, and it is based on the number of images contained in over 2.6 *million* documents. Met's specious arguments do nothing to alter the court's conclusion that 2.3 images per document is the least speculative measure of damages for the untendered documents.

**Second, Met correctly notes that**

> **the Court has been . . . misled by a typographical error in Defendants' pleadings** which contradicts the Plaintiff's Complaint and all of the available evidence in this case. According to Plaintiff's complaint, MetLife tendered 146,459 documents in Year Three, not 347,000 documents.

Met Recon. Mot. at 2. Pinika states, "plaintiff agrees that the correct number [for Year Three tendered documents] is 146,459 documents, not 347,000." P's Opp at 1. The court will use the corrected, lower number in calculating the amount of document-management fees Met owed for Year Three Tendered Documents.

**Met's third and last argument is that it overpaid for Year Three Tendered Documents by $13,390.** Met's discussion on this point is less than clear, and it reads as follows:

> MetLife tendered the $9,720.00 early termination fee outlined in Section[s] 2.2(a) and 11.10 of the Agreement. MetLife also undisputedly tendered an additional $13,390.
>
> * * * [O]nly 146,459 documents were tendered in Year Three. Complaint at ¶ 11 . . . . Further the Plaintiff does not dispute that it has received payment for these documents. The Court has held that MetLife is only liable for documents it tendered in Year Three that were not paid for. Opinion at p. 13 . . . . However, the court was inadvertently misled into believing that this number was 347,000 documents when there were no documents that were not paid for. Opinion at p. 13, ¶ 2 . . . .
>
> Additionally, the court adopted Plaintiff's argument that based upon the erroneous affidavit of Michael Wiley, MetLife's payment of $13,390.00 did not cover the phantom 347,000 documents. Opinion at p. 17, ¶ 3 . . . .
>
> As it is now clear that these 347,000 documents never existed, MetLife urges this court to reconsider it's [sic] Opinion that MetLife is liable for these documents and apply the Year Three payment to any Year Two damages.

Met's Recon. Mot. at 6-7 (footnote 15 omitted, ¶ break added). The court again notes the parties' agreement that Met tendered only 146,459 documents in Year Three before terminating the contract.

Met seems to argue that its $13,390 Year Three payment – but not its payment of a $9,720 early-termination fee – was entirely erroneous and a windfall to Pinika (Paladigm).

In contrast, Pinika contends that Met owes the following for Year Three Tendered Documents: $45,653.92 in document-management service fees (see Order section below), minus the $13,390 Met paid that year, for a total of $32,263.02.

Met asserts that "Plaintiff does not dispute that it received [full] payment for these [146,459 Year Three Tendered] documents", Met's Recon. Mot. at 7, but Pinika certainly does dispute that:

> To the contrary, plaintiff does dispute that it received full payment for the documents received from and the images processed for MetLife in 2003 [partial Year Three of the contract]. [D]efendant offers absolutely no support for its claim that it "paid for" the 146,459 documents provided to Paladigm and processed by it in Year Three. Nothing in plaintiff's submissions constitutes or was intended to constitute an "admission" to the contrary.

P's Opp at 8.  The court does not perceive the necessity for bringing such conclusory "he said, he said" back-and-forth to the court, in the absence of competent evidence.  Such evidence should not be difficult to obtain.  The parties will cooperate with one another to ascertain how much Met paid Paladigm towards document-management/imaging fees for the Year Three Tendered Documents.[2]

## INTEREST

When a federal court enters a judgment for monetary damages on a state-law claim, "federal law controls post-judgment interest but state law governs awards of prejudgment interest."  *Estate of Riddle v. So. Farm Bur. Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005).  This rule applies even where, as here, the case arrived here only by removal, and there was no federal-question jurisdiction, i.e., no part of the judgment consists of damages on a federal-law claim.  *See Chouinard v. KinderCare Learning Ctrs., Inc.*, 2008 WL 913322, *3 (M.D. Tenn. Mar. 31, 2008).

The federal post-judgment interest statute provides, in pertinent part,

> Interest *shall* be allowed on any money judgment in a civil case recovered in a district court.  * * *  Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors for the Federal Reserve System, for the calendar week preceding the date of judgment.

28 U.S.C. § 1961(a) (emphasis added).  As the word "shall" suggests, post-judgment interest under this statute is mandatory.  *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002).

Because this court should have entered judgment for Pinika as to Year Two at the time of

---

[2]

The court rejects Met's attempt to avoid the issue of how much it paid, or did not pay, towards its document-management/imaging fee liability for the Year Three Tendered Documents, by objecting that Pinika's complaint did not assert a separate claim seeking payment on an unpaid invoice or invoices from Year Three.  *See* Met's Reply at 2-3.

the original decision on summary judgment, the Amended Judgment which ultimately issues in this case will relate back to the date of that decision *for purposes of federal statutory post-judgment interest*.  In other words, Pinika is entitled to post-judgment interest from the date of the partially-erroneous summary-judgment opinion, because it was this court's error regarding Year Two which deprived Pinika of judgment on Year Two from that time until the final amended judgment.

"Interest shall be computed daily to the date of payment except as provided in [28 U.S.C. § 2516(b)] and [31 U.S.C. § 1304(b)], and shall be compounded annually."  28 U.S.C. § 1961(b).  For daily interest rates from Monday, March 30, 2009 through Sunday, April 5, 2009, the week which includes the date this judgment was issued, the parties are referred to http://www.federalreserve.gov/releases/h15/20090330 ("Federal Reserve Statistical Release, H. 15 Selected Interest Rates" released at 2:30 p.m. on March 30, 2009), last retrieved August 19, 2009.

Finally, post-judgment interest shall be calculated not only on the compensatory damages, but on the sum of those damages plus state-law prejudgment interest.  *See, e.g., City of Owensboro v. Ky. Utils. Co.*, 2009 WL 424996, *1 (W.D. Ky. Feb. 19, 2009) (McKinley, J.).

## ORDER

Defendant's reconsideration motion [doc. # 60] is **GRANTED in part** & **DENIED in part**.

**As to Year Two, the court HOLDS that:**

–    Met breached the contract by tendering fewer than 1,000,000 documents for imaging.

–    Damages are due on 294,844 non-tendered documents.

–    Damages are calculated at $0.13 per image and an assumed 2.3 images per document.

–    **Met SHALL PAY to Pinika $88,158.36 in unpaid Year Two document management service fees, plus any applicable interest.**[3]

**As to Year Three, the court holds that:**

–    Met did <u>not</u> breach by failing to tender 1,000,000 documents for imaging;

–    Met breached by failing to pay at $0.13 for each image contained in the *146,459* documents it tendered for imaging during the pre-termination portion of Year Three.

–    Damages are calculated at $0.13 per image and an actual 351,184 images.[4]

–    **Met IS LIABLE for $45,653.92 in Year Three document management service fees, with possible downward adjustment as noted below, plus any applicable**

---

[3]    Met was obligated to tender 294,844 additional documents for imaging in Year Two.

Assuming that each of those documents contained 2.3 images – the average for all the documents actually tendered during the entire life of the contract – these documents would have contained an 294,844 multiplied by 2.3 = 678,141.2 images.

[4]    Met tendered 146,459 documents for imaging in Year Three.

Based on an undisputed affidavit and calculations presented by Pinika, those documents *actually* contained 351,184 images.  *See* Pinika's Opp, Attachment (Declaration of Kim Allen, President of Pinika LLC, dated May 19, 2009.

interest.

**No later than Friday, October 23, 2009, the parties SHALL jointly file the following:**

1.     **A notice stating** how much MetLife paid for the Year Three Tendered Documents, and how much, if anything, MetLife still owes for those documents; and

2.     **A notice proposing the amounts which Met should pay as:**

–     state-law pre-judgment interest on the Year 2 damages;

–     federal-law post-judgment interest on the sum [Year 2 damages + pre-judgment interest]

–     state-law pre-judgment interest on the sum [Year 3 Tendered Documents damages];

–     federal-law post-judgment interest on the sum [Year 3 Tendered Documents damages + pre-judgment interest];

–     contractual or statutory attorney's fees and costs, if any.

The parties shall provide calculations and citations to authority to explain and justify their proposals.

Absent extraordinary circumstances, such as the issuance of new *binding* precedent squarely on point, the court will <u>not</u> entertain any further Rule 59(e) motions for reconsideration, or Rule 60(b) motions for relief from judgment, from either party.

This is <u>not</u> a final and appealable order, because damages have not yet been ascertained with certainty. *See SEC v. Smith*, 95 F. App'x 148, 150 (6th Cir. 2004) ("Generally, a judgment is not a 'final decision' for purposes of [28 U.S.C.] § 1291 'when the assessment of damages remains.'") (quoting *Woosley v. Avco Corp.*, 944 F.2d 313, 316 (6th Cir. 1991)).

**IT IS SO ORDERED this     24th     day of August 2009.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
United States District Judge